WILLIAM M. JONES, The (BUCKLEY v.). See Case No. 2,095.

WILLIAM PENN, The (BROOKS v.). See Case No. 1,965.

WILLIAM PENN. The (CRAWFORD v.). See Cases Nos. 3,372 and 3,373.

WILLIAM POPE. The (UNITED STATES v.). See Case No. 16,708.

## Case No. 17,699.

### Ex parte WILLIAMS.

[4 Cranch, C. C. 343.] [1]

Circuit Court, District of Columbia.　Nov. Term, 1833.

CORPORATION OF WASHINGTON — POWERS — CONFINEMENT TO LABOR — FREE BLACKS AND MULATTOES—PLAYING AT CARDS.

1. No person can be detained upon a commitment which does not show sufficient cause upon its face.

[Cited in Erwin v. U. S., 37 Fed. 486.]

2. There is no law in the county of Washington, to justify the commitment of a man to hard labor by. a justice of the peace, for playing at cards, even if he be a free black or mulatto, and unable to pay the fine imposed on him by the justice.

3. The 8th section of the by-law of 31st May, 1827. is not. so far as it authorizes a commitment to the work-house for the non-payment of a fine, warranted by the charter, except in the case of the nightly and other disorderly meetings of slaves. free negroes and mulattoes, who are unable to pay the fine.

4. By the 8th section of the charter, the only persons who may be confined to labor for not paying a fine are free negroes, or mulattoes, who are unable to pay such penalty.

5. Confinement to labor is a severe proceeding, and should be strictly confined to the case in which alone it is authorized by the charter.

6. The power was not originally given as a substituted punishment in lieu of the penalty, but as the means of obtaining payment of the penalty.

7. In case of inability to pay, he is to give an equivalent in labor.

8. The corporation had no authority to compel a person to labor, who was able and refused to pay.

9. The by-law which attempts to give authority to a justice to commit the defendant to labor for a refusal to pay, is not warranted by the charter.

10. A commitment under the by-law, must charge that the offence was committed by a free black or mulatto.

Habeas corpus, to Richard Butts, intendant of the Washington Asylum, commanding him to bring up the body of Thomas Williams, with the cause, &c., to do and submit, &c.

Upon the return it appeared that the said Thomas Williams was detained by virtue of the following warrant: "District of Columbia, county of Washington, to wit. To Richard Butt, intendant of the Washington Asylum, greeting. Whereas the mayor, board of aldermen, and board of common council of the city of Washington, recovered judgment for $10 fine, and $1.58⅓ cents costs, against Thomas Williams, for playing at cards, &c., before Robert Clarke, Esq., a justice of the peace for the county aforesaid, on the 26th day of July. 1833, and the said Thomas Williams refuses to pay or satisfy the aforesaid judgment: You are therefore commanded to take into your custody the body of the said Thomas Williams, and him keep at hard labor into the penitentiary department of the Washington Asylum, thirty days, until he shall be otherwise discharged by due course of law. Hereof fail not. Given under my hand and seal, this 22d day of October, 1833. John D. Clarke. (L. S.) To John Waters, a constable, of Washington county."

CRANCH, Chief Judge, delivered the opinion of the court, (THRUSTON. Circuit Judge, contra.)

The by-law under which this prosecution is supposed to have been instituted, was passed on the 31st of May, 1827, (sections 4 and 8) entitled "An act concerning free negroes, mulattoes. and slaves." By the 4th section it is enacted, "That if any free black or mulatto person shall be found playing at cards, dice, or any other game of an immoral tendency, or shall be present as one of the company where such game is playing. on conviction thereof, before a justice of the peace, shall forfeit and pay a fine not exceeding $10." By the 8th section it is enacted. "That any free black or mulatto person. who shall be fined under any of the provisions of this act, on refusing or neglecting to pay, or secure to be paid, such fine. shall be committed to the work-house. until such fine be paid, for any

[1] [Reported by Hon. William Cranch, Chief Judge.]

period of time, not exceeding six months." The act of congress of the 15th of May, 1820 (3 Stat. 583), "To incorporate the inhabitants of the city of Washington, and to repeal all acts," &c., among other powers gives the corporation (by the 7th section,) power "to restrain or prohibit" "all kinds of gaming," and "impose and appropriate fines, penalties, and forfeitures, for the breach of their laws or ordinances;" and by the 8th section, "to establish and erect work-houses, houses of correction, penitentiary, and other public buildings;" "to restrain and prohibit the nightly and other disorderly meetings of slaves, free negroes, and mulattoes, and to punish such slaves by whipping, not exceeding forty stripes, or by imprisonment not exceeding six months for any one offence; and to punish such free negroes and mulattoes, by penalties not exceeding $20 for any one offence; and in case of the inability of any such free negro or mulatto to pay any such penalty and cost thereon, to cause him or her to be confined to labor for any time, not exceeding six calendar months;" "to punish, corporeally, any colored servant or slave for a breach of any of their ordinances, unless the owner or holder of such servant or slave shall pay the fine in such cases provided; and to pass all laws which shall be deemed necessary and proper for carrying into execution the powers vested by this act, in the said corporation or its officers." By the 9th section it is enacted: "That the marshal of the District of Columbia shall receive and safe keep within the jail for the county of Washington, at the expense of the corporation, all persons committed thereto under, or by authority of the provisions of this act. And in all cases where suit shall be brought before a justice of the peace, for the recovery of any fine or penalty arising or incurred for the breach of any law or ordinance of the corporation, execution shall and may be issued as in other cases of small debts." By the law of the 5th of April, 1821 (section 12), it is enacted: "That at the asylum there shall be a separate apartment or apartments for the reception of vagrants and persons committed for offences against the laws of the corporation. And the intendant of the asylum, under the directions of the guardians of the poor, shall have the care of all such vagrants, and persons committed as aforesaid, and shall keep them employed in some useful work." The by-law of the 5th of July, 1821, speaks of the work-house and the penitentiary department of the Washington Asylum as the same place.

A temporary work-house had been provided by the by-law of the 15th of November, 1813, for the reception of such persons as should be committed under the act of the 16th of December, 1812; and the mayor was to appoint some fit person to be styled "superintendent of the work-house," whose duty it should be "to superintend the work-house and persons committed to his charge, and keep such persons at hard labor, for and during the term for which they shall have been committed." In

the third section of the same by-law it is called, "said penitentiary." The by-law of the 6th of April, 1815, suspends the use of the temporary work-house, and the duties of the superintendent ceased. A part of the poor-house was ordered to be fitted up for the same purpose and put under the care of the superintendent of the poor-house, who was required to keep the prisoners at hard labor. In the seventh and eighth sections of the same by-law it is called "the said penitentiary or poor-house." In the by-law of the 25th of June, 1818, it is called "the temporary penitentiary or work-house," and it is made a "part of the poor-house establishment." And the by-law of the 14th of April, 1821, calls it, "the work-house."

Upon the whole, it seems probable that "the work-house" mentioned in the eighth section of the by-law of the 31st of May, 1827, was the apartment or apartments in the asylum directed to be prepared, by the twelfth section of the by-law of the 5th of April, 1821, c. 124, and which, in the by-law of July 5th, 1821, is called "the penitentiary department of the Washington Asylum." A commitment, therefore, "to the penitentiary department of the Washington Asylum," was a commitment to the work-house, within the meaning of the eighth section of the by-law of May 31st, 1827. No person can be detained upon a commitment which does not show sufficient cause upon its face. There is no law, in this county, to justify the commitment of a man to hard labor by a justice of the peace for playing at cards, even if he be a free black or mulatto, and unable to pay the fine imposed on him by the justice. The eighth section of the by-law of 31st of May, 1827, is not, so far as it authorizes a commitment to the work-house for non-payment of a fine, or penalty, warranted by the charter, except in the single case of the nightly and other disorderly meetings of slaves, free negroes, and mulattoes, who are "unable" to pay the fine or penalty. By the eighth section of the charter of 1820, the only persons who may be confined to labor, for not paying a fine or penalty, are free negroes or mulattoes who are unable to pay "such penalty." The penalty meant is the penalty incurred by "such free negroes and mulattoes," as shall be guilty of the nightly and other disorderly meetings, which the corporation is, in the same sentence, authorized to restrain and prohibit. By the same section power is given to the corporation "to restrain and prohibit the nightly and other disorderly meetings of free negroes and mulattoes;" "and to punish such free negroes and mulattoes by penalties not exceeding twenty dollars for any one offence;" (that is, the offence of disorderly meeting.) "And in case of the inability of any such free negro or mulatto," (that is, the free negro or mulatto who has incurred the penalty for a disorderly meeting,) "to pay any such penalty," (that is, the penalty for a disorderly meeting,) "and costs thereon," "to cause him or her," (that is, the free negro or

mulatto who had incurred the penalty for the disorderly meeting, and is unable to pay it,) "to be confined to labor for any time, not exceeding six calendar months."

Confinement to labor, in lieu of a pecuniary penalty, is a severe proceeding, and should be strictly confined to the case in which alone it is authorized by the charter. The power was not originally given as a substituted punishment in lieu of the penalty, but as the means of obtaining payment of the penalty, as is apparent from the provision of the act of congress of the 4th of May, 1812 (2 Stat. 721), "further to amend the charter," and which continued in force until the new charter was granted in 1820. The words of that act are, "To restrain and prohibit the nightly and other disorderly meetings of slaves, free negroes, and mulattoes;" "and to punish such free negroes and mulattoes for such offences by fixed penalties not exceeding twenty dollars for any one offence; and in case of the inability of any such free negro or mulatto to pay and satisfy any such penalty and costs thereon, to cause such free negro or mulatto to be confined to labor, for such reasonable time. not exceeding six calendar months, for any one offence, as may be deemed equivalent to such penalty, and costs;" that is, that, in case of inability to pay, he was to give an equivalent in labor. The word "inability," in both charters, contains an · important restriction of the power to sentence the offender to labor. If the defendant was able to pay the penalty, it might be recovered, (without resorting to this severe remedy,) by fieri facias, or by simple imprisonment upon a ca. sa. to compel a surrender of his property. The corporation had no authority to compel a person to labor who was able and refused to pay; or merely because he refused to pay. The by-law, therefore, which attempts to give authority to the justice to commit the defendant to labor, merely for a refusal to pay, is not warranted by the charter, and is void as to the power to commit to labor for any of the offences described in that by-law. In the case of vagrants, and keepers of public gaming-tables, who may be required to give security for their good behavior, the charter has provided for the case of their refusal, as well as for their inability to give it. Its omission to do so in the case of disorderly meetings of free negroes, &c., is evidence of a different intention as to them.

But not only is the by-law not warranted by the charter, but the commitment does not describe any offence under the by-law. It does not state that the defendant was a free negro or mulatto, to whom alone the by-law is applicable. It states the offence to be "playing at cards," &c., but that is no offence for which the party may be confined to labor, unless committed by a free black, or mulatto; a fact not stated in the description of the offence charged in the warrant.

For these reasons a majority of the judges think the prisoner ought to be discharged.